UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v. ) | Case No. 2:24-cr-00135 – 1 |
| ) | |
| DARYN BARSALOU, ) | |
| Defendant. ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (GLOCK) AND GRANTING DEFENDANT'S MOTION TO SUPPRESS (RIFLES)
(Doc. 62; Doc. 61)

Pending before the court are Defendant Daryn Barsalou's motions to suppress physical evidence obtained as a result of two searches, one on December 3, 2024, (Doc. 62), and one on December 6, 2024. (Doc. 61.) On December 3, 2024, officers searched a vehicle in which Barsalou had been a passenger. (Doc. 62.) On December 6, 2024, police officers searched a camper located in the yard of the residence listed on the search warrant. (Doc. 61.)

Defendant argues the seizures violated the Fourth Amendment because the officers lacked probable cause to search the vehicle, and the officers' search of the camper exceeded the scope of the warrant. The Government opposed the motions on September 26, 2025. (Doc. 68.) Defendant filed two replies on October 3, 2025. (Doc. 69; Doc. 70.) The court held a hearing on Defendant's motions on November 17, 2025. (Doc. 75.) At the hearing, the court requested additional briefing from the parties regarding the issue of whether the camper was a separate residence. (*Id.*) Defendant filed a supplemental brief on December 11, 2025. (Doc. 76.) The Government filed its supplemental memorandum on December 12, 2025. (Doc. 77.)

On April 3, 2025, a federal grand jury returned a Superseding Indictment charging Defendant with Count I: conspiring to manufacture, distribute, and possess cocaine, cocaine base,

and fentanyl between November 2024 and December 3, 2024, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; and Count II: possessing four firearms between November 27, 2024 and December 3, 2024, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Doc. 34.)

The Government is represented by Assistant United States Attorney Wendy L. Fuller. Defendant is represented by Matthew D. Anderson.

**Findings of Fact**

On November 27, 2024, just before 1:00 a.m., Bristol Police Officer Francis Smith responded to a shooting at 40 Adirondack View, Apartment 5, in Bristol, Vermont. When he arrived at the apartment, he observed the male who rented the apartment, in a bedroom, with a gunshot wound to the center of his forehead. Officer Smith provided aid to the individual until emergency personnel arrived. The victim was transported by ambulance to the University of Vermont Medical Center where he died.

During his investigation into this incident, Officer Smith learned two individuals, Daryn Barsalou and Chelsea Thatcher, were present with the victim in the bedroom when he was shot. Barsalou told Officer Smith the decedent shot himself. Barsalou indicated it was common for both Barsalou and the decedent to unload their guns and then "dry fire" them, pointing the gun at their hearts.

Officer Smith recovered a black Ruger .22 caliber pistol from the dresser in the bedroom where the shooting occurred. The pistol was loaded with a magazine containing five rounds of ammunition. Barsalou and Thatcher identified this as the gun that was used in the shooting.

Two days later, on November 29, 2024, Bristol Police Sergeant Andrew Graham spoke with Barsalou again about what had occurred. This conversation happened at 40 Adirondack View. Barsalou indicated the firearm used in the shooting had been in the living room and he knew the

gun was loaded. Barsalou stated that he brought the weapon into the bedroom and gave it to the decedent, telling him it was loaded. Barsalou stated after he gave the gun to the decedent, the decedent put the firearm to his forehead and pulled the trigger.

Later that day, Sergeant Graham returned to the apartment and retrieved two rifles from Barsalou and Thatcher. During this interaction, Barsalou acknowledged he was not lawfully able to possess firearms. Law enforcement confirmed Barsalou had a felony conviction in the State of Vermont.

On December 3, 2024, the United States District Court for the District of Vermont issued a warrant for Barsalou's arrest based on a finding of probable cause that he unlawfully possessed a firearm after having been convicted of an offense punishable by imprisonment for a term exceeding one year. On this same day, law enforcement spoke to two witnesses regarding Barsalou and Thatcher's actions following the shooting. Specifically, law enforcement learned that after the decedent left the apartment in the ambulance, and before Barsalou and Thatcher went to the hospital, Barsalou removed several firearms from the apartment and placed them into a car. The two witnesses accompanied Barsalou and Thatcher to the hospital. After leaving the hospital following the victim's death, the vehicle driven by Barsalou experienced a problem with one of its tires. Barsalou and Thatcher called someone to come and help them. Individuals in another vehicle responded. When that vehicle arrived, Barsalou moved several guns, including an AR-15, 30-30, a 12-gauge shotgun and four different pistols, into the other vehicle.

On the day the warrant for Barsalou's arrest issued, Bristol Police Officers located a white Mercedes known to be in the possession of Barsalou and Thatcher in a driveway in Bristol. Barsalou was seated in the front seat passenger. He was arrested on the warrant. After Barsalou was taken into custody, law enforcement towed the vehicle to the Bristol Police Department where

they conducted a probable cause search of the vehicle. During the search, a loaded Glock 9 mm pistol was located between the center console and the front passenger seat when Barsalou had been sitting. Several other items were noted to have been located, including money in the glove compartment and a case containing a small amount of a substance which tested positive for cocaine.

Law enforcement also detained Thatcher and transported her to the Bristol Police Department where she was interviewed. Thatcher advised that after the decedent left his apartment in the ambulance on the night of the shooting, his guns were removed from the apartment and put into the car. She confirmed the information provided by other witnesses that they met up with other people after leaving the hospital and Barsalou gave them the firearms that had been taken from the house. She identified one of the individuals as "Kenny."

According to Thatcher, approximately twenty-four to forty-eight hours later, she and Barsalou brought more guns from decedent's apartment to a residence in Starksboro. Thatcher described the residence as Barsalou's house and a place he was staying. Thatcher indicated that Barsalou went into the house by himself and dropped off the guns.

For a number of identified reasons, law enforcement believed the house described by Thatcher to be located at 104 Shamrock Drive in Starksboro, Vermont. They applied for a warrant "authorizing the search of the residence located at 104 Shamrock Drive in Starksboro, Vermont (the "Subject Premises") described below and within Attachment A" for evidence of, among other things, firearms. (Doc. 61-1 at 4.) On December 5, 2024, the Honorable Kevin J. Doyle granted a search warrant authorizing the search of the property described in Attachment A. (*Id.* at 1.) Attachment A, in its entirety, reads as follows:

4

**Premises to be searched – Subject Premises**

The Subject Premises is located at 104 Shamrock Drive in Starksboro, Vermont. The Subject Premises is a raised ranch with brown vertical clapboards and a red tin roof. Some of the windows have red shutters on the side of the house facing the road. The residence is the only house located at end of Shamrock Drive and is located on the left side of the road. The yard is filled with old vehicles, wood, trailers, and old campers.

(*Id.* at 2.)

The search warrant was executed on December 6, 2024. Inside the residence, law enforcement encountered Kenneth Bell, Natalie Huestis-Bell and Marjorie Trombley. Very little detail about the search has been provided to the court. Three rifles were located by law enforcement in a large camper situated in the front yard of the raised ranch. The specific dimensions of the camper are unknown to the court, but based on pictures provided, it is sufficiently large to allow someone to live in the camper. While the camper is not in the best condition, it appears to be sufficiently intact to provide shelter to one or more individuals. The parties agree that Barsalou stayed "for a time" in the camper. A door to the residence at 104 Shamrock Drive is visible in a picture of the camper, but the court has no specific information as to how close the camper is in relation to that door. The court does find the camper to be relatively close to the door of the residence.

The court has not been provided with information regarding the layout of the camper. There is a mattress in the camper. There is also a cabinet, which appears to be a medicine cabinet, containing some hygiene products. Specifically, there is a prescription pill bottle, hairbrush, ear wax remover bottle, deodorant, and a picture of a child. It is unknown if this cabinet was open or closed at the time police entered the trailer. Additionally, law enforcement found a wallet in the camper, which contained credit cards and other identification documents in Barsalou's name. There is no evidence as to where or when the wallet was located.

## Conclusions of Law and Analysis

I.   **Motion to Suppress Glock and Other Evidence Found in the Vehicle.**

Defendant moves to suppress the evidence recovered in the search of the white Mercedes after he had been arrested. (*See* Doc. 62 at 1.) Barsalou was a passenger in the vehicle before being taken into custody. (*Id.*)

The court turns to whether Defendant had a reasonable expectation of privacy in the Mercedes in which he was a passenger. The Government contends that Barsalou had no such reasonable expectation and thus lacked standing to challenge the search of this vehicle because it was owned by the decedent. (Doc. 68 at 12.)

Instead of a separate standing analysis, the Supreme Court and the Second Circuit hold the analysis should "focus[] on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1998) (quoting *Rakas v. Illinois*, 439 U.S. 139 (1978)). Defendant bears the burden of establishing whether his own rights under the Fourth Amendment have been violated. *See Paulino*, 850 F.2d at 96.

The *Rakas* Court ruled that passengers could not challenge the search of a vehicle because they had failed to assert "a property [or] possessory interest" in the car or in the evidence seized. *Rakas*, 439 U.S. at 148. Specifically, passengers of a car would need to assert a "legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers." *Id.* Borrowers of vehicles, not just owners, can assert a legitimate Fourth Amendment privacy interest in a vehicle as well. *See United States v. Pena*, 961 F.2d 333, 337 (2d Cir. 1992) (citing *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991)). Defendants challenging a search of a vehicle they do not own need to have a "legitimate basis" for being in

the car, "such as permission from the owner." *Ponce*, 947 F.2d at 649 (citing *United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir. 1979)).

The initial question posed by Defendant is whether he "had a reasonable expectation of privacy in the area of the vehicle searched." *Pena*, 961 F.2d at 337 (quoting *Paulino*, 850 F.2d at 97)). In *Pena*, the defendant provided a detailed affidavit describing his relationship with the car, including that the owner had given him permission to use the car overnight and the defendant had plans to purchase the car the following day. *Id.* at 335–36. The Second Circuit found the affidavit had raised sufficient questions on the record, which needed to be answered by a suppression hearing. *Id.* at 338. The purpose of the hearing was for the district court to determine if the defendant had established a legitimate and protectible Fourth Amendment interest. *Id.*

Here, Defendant asserts he had been friends with the decedent since childhood and he was distraught over his death. (Doc. 69 at 2–3.) Additionally, Defendant highlights that he and the co-defendant, decedent's girlfriend, used the vehicle to visit the decedent in the hospital after the incident. (*Id.* at 2.) Defendant attempts to elevate his relationship with the Mercedes as the same one has with a rental car—except to say that in this case Defendant "had a deeply personal relationship with the deceased loved one's car that no commercial car renter has with their rental." (*Id.* at 3.)

The court disagrees. Despite the alleged relationship between the owner of the vehicle and Barsalou, Defendant has not provided any evidence to suggest he had lawful permission to use the Mercedes. Car renters have legal permission to use a vehicle that can be proved through rental car agreements. In this case, the relationship between friends does not equate to authorization to use his vehicle. While Defendant presented evidence that he drove the vehicle after his friend was taken to the hospital, this does not establish he drove with his friend's permission. At that time,

his friend had already been taken by ambulance to the hospital, and because of his injury, was physically unable to grant permission.

Officers found a gun between the center console and the front passenger seat. (Doc. 68 at 3.) The money was found in the glove compartment. (Doc. 61-1 at 11, ¶ 18.) It is unclear to the court where the other evidence recovered from the search of the Mercedes was discovered in the vehicle. (Doc. 68 at 3.) The court need not decide, however, whether Defendant had a reasonable expectation of privacy in these areas of the car, because Defendant has not shown a legitimate basis for being in the vehicle at all.

Since this motion is resolved by Defendant's failure to assert a Fourth Amendment interest in the Mercedes, the court does not need to address the merits of the probable cause issue. For the foregoing reasons, Defendant's Motion to Suppress the evidence recovered in the search of the Mercedes is DENIED.

## II.  Motion to Suppress Three Rifles Found in the Camper.

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*

As an initial matter, the Government, in their opposition, argued Barsalou did not have standing to challenge the search under the Fourth Amendment. (Doc. 68 at 5.) At the hearing, the Government amended their position because they had spoken to the property owners who confirmed that Defendant had stayed in the camper, at least for a time. As a result, the Government conceded that Defendant has standing as to challenge the search of the camper.

The Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This particularity requirement prevents "general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "A failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) (citation omitted).

Warrants satisfy the particularity requirement by meeting the following three criteria: "(1) it must identify the specific offense for which the police have established probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (citation modified). "The scope of a search pursuant to a valid warrant is defined by the warrant's description of the premises and the objects of the search, and by places in which the officers have probable cause to believe those objects may be found." *United States v. Kyles*, 40 F.3d 519, 523 (2d Cir. 1994) (citing *Garrison*, 480 U.S. at 84).

Here, the premises to be searched was described in Attachment A to the search warrant:

> The Subject Premises is a raised ranch with brown vertical clapboards and a red tin roof. Some of the windows have red shutters on the side of the house facing the road. The residence is the only house located at end of Shamrock Drive and is located on the left side of the road. The yard is filled with old vehicles, wood, trailers, and old campers.

(Doc. 61-1 at 2.)

Defendant argues the intentional capitalizing of "Subject Premises" defines the scope of the warrant as the ranch house. (Doc. 70 at 4.) Defendant argues the additional sentences are meant to describe the surrounding area for the purpose of identifying the residence. (*Id.*) The

Government counters that the mention of "old campers" provided law enforcement officers the authority to search the camper. (Doc. 68 at 6.)

The plain language used in the warrant states "[t]he Subject Premises is a raised ranch with brown vertical clapboards and a red tin roof." (Doc. 61-1 at 2.) The particularity requirement requires premises to be described in detail, including providing information of the surrounding area so law enforcement may execute the search in the correct residence. Each sentence after the initial one in Attachment A is used to further describe which residence is to be searched. The inclusion of the "old campers" was used in that list of descriptors. The mere mention of "old campers" in the yard did not alter or expand the original sentence that "[t]he Subject Premises is a raised ranch with brown vertical clapboards and a red tin roof." (*Id.*) The court cannot conclude that a search of the camper was authorized by the plain language of the warrant.

The Government next contends that if the plain language does not authorize the search of the camper, the search is still permissible because "the camper was within the curtilage of the property." (Doc. 68 at 7.) "At the 'very core' of the Fourth Amendment 'stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion.'" *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "The area immediately surrounding and associated with the home," known as the curtilage, is considered "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation modified).

An area is determined to be curtilage by using the factors established by the Supreme Court in *United States v. Dunn*, 480 U.S. 294 (1987). The four primary factors to consider are: (1) "the proximity of the area claimed to be the curtilage to the home;" (2) "whether the area is included within an enclosure surrounding the home;" (3) the nature of the uses to which the area is put;"

10

and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301.

If the camper is determined to be within the home's curtilage, the question becomes whether a search warrant's authorization of a search of the residence at 104 Shamrock Drive included the camper. The Circuits that have addressed the issue have held that "if an outbuilding is included within the home's curtilage, a search warrant authorizing a search of a defendant's residence permits the search of items and buildings within the curtilage as well." *United States v. Mangual*, No. 2:23-cr-00119-1, 2025 WL 18437, at *3 (D. Vt. Jan. 2, 2025) (citations omitted); *see also United States v. Babin*, 817 F. App'x 23 (5th Cir. 2020); *United States v. Montieth*, 662 F.3d 660 (4th Cir. 2011); *United States v. Paull*, 551 F.3d 516 (6th Cir. 2009); *United States v. Earls*, 42 F.3d 1321 (10th Cir. 1994); *United States v. Griffin*, 827 F.2d 1108 (7th Cir. 1987). Most recently, this district joined the majority and held a search of a shed located in the backyard of a property and within the curtilage of the home, was authorized by the search warrant. *Mangual*, 2025 WL 18437, at *5.

These cases, however, all consider a shed, outbuilding or other type of storage area. They do not address the specific circumstances of a camper, whose primary purpose is to be a place to stay or living space for an individual or individuals. Notably, the Ninth Circuit's decision in *United States v. Cannon*, 264 F.3d 875 (9th Cir. 2001), is particularly instructive on this issue. In *Cannon*, the Circuit court held storage rooms in a detached building were included in the curtilage of the main dwelling, and therefore, their search was authorized by the warrant. *Id.* at 879. A rented-out room in the same detached building, however, was a separate residence that would have required an additional warrant to be searched. *Id.* The Circuit ruled that any evidence discovered in the rental unit would not have been admissible evidence. *Id.* at 880.

*Cannon*'s distinction between the locked storage rooms and the rented-out residential unit supports the position that the Constitution protects the privacy of separate residences on one property. In considering whether the premises searched is a separate residence, courts are instructed to look at the "totality of the circumstances," and assess the factors that would "alert law enforcement to the need to limit their search or obtain an additional warrant . . . ." *United States v. Houston*, No. 5:15-cr-373-3-H, 2016 WL 4147642, at *8 (E.D.N.C. July 11, 2016), *report and recommendation adopted as modified*, No. 5:15-cr-373-3H, 2016 WL 4148308 (E.D.N.C. Aug. 4, 2016). Factors courts have used to evaluate whether a premise is a separate residence include: "multiple doorbells; separate utilities; multiple mailboxes; separate kitchens and bathrooms for each unit; designations on the entry to each unit indicating that it is recognized, at least by the occupants, as being a separate dwelling; and physical separation between units that restrict access by others." *Id.*; *see also Kyles*, 40 F.3d at 524 ("Factors that indicate a separate residence include separate access from the outside, separate doorbells, and separate mailboxes." (citation omitted)).

Many of the cases that have addressed this issue consider the question whether there are multiple residences within one building that is occupied by multiple people. *See, e.g., United States v. Reddick*, No. 3:17-cr-00135 (JAM), 2017 WL 6527431 (D. Conn. Dec. 21, 2017); *Houston*, 2016 WL 4148308; *United States v. Wiggins*, No. 4:21-cr-00066, 2023 WL 5321077 (S.D. Tex. Aug. 18, 2022); *United States v. Ferreras*, 192 F.3d 5 (1st Cir. 1999). Here, the area in question is a stationary camper in the yard. There are separate entrances between the ranch house and the camper. The camper, as campers of this size generally do, appears to have a separate bedroom. It contains at least one cabinet which appears to be a medicine cabinet. These factors are indicative that the camper may be used as a residence.

The Government contends there is no evidence that Defendant stayed regularly in the camper or that he had the right to exclude others from inside the camper. (Doc. 77 at 6.) Additionally, the Government highlights that the lack of evidence indicating whether the camper was adequate as a living space—specifically, no evidence has been presented that the camper was hooked up to heat, water, or electricity. (*Id.*)

The Government's analysis does not accurately reflect the issue. The inquiry is to evaluate the facts that would have indicated to law enforcement there were multiple residences on the property, and a separate warrant was needed. In the current case, the most important piece of evidence is the photograph provided by the Government in its original Opposition to the Motion which shows the camper. (Doc. 68 at 8.) Campers, like the one in the photograph, have the hallmark characteristics of a home. Evidence of whether the camper was connected to heat or water is unnecessary to inform the officers as they approached this camper that they could be entering into a separate residence. The Government conceded at the hearing that Defendant "did stay for a time, at least for a time inside the camper." The officers entered and searched the camper in violation of the Fourth Amendment.

Since a violation has been established, the last inquiry is whether the good faith exception to the Fourth Amendment exclusionary rule should be applied. Under the good faith exception, suppression of evidence is not warranted when officers rely in good faith on an objectively reasonable search warrant issued by a neutral and detached magistrate. *United States v. Leon*, 468 U.S. 897, 900 (1984). The United States Supreme Court has held "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring v. United States*, 555 U.S. 135, 143 (2009) (citation modified). Evidence will be excluded if it is

determined that the law enforcement's conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

The Supreme Court's standard in *Leon* for assessing good faith is an objective standard. *Leon*, 468 U.S. at 920. "The objective standard we adopt . . . requires officers to have a reasonable knowledge of what the law prohibits." *Id.* at 920 n.20. A fundamental tenet underlying the Fourth Amendment is to protect against government entry into private homes without approval by a judicial officer. *See United States v. Long Huang You*, 198 F. Supp. 2d 393, 401 (S.D.N.Y. 2002). It is the chief evil which the Fourth Amendment is intended to prevent. *Id.* While society may have different standards over what a home should have or be, the Fourth Amendment protects the most dilapidated home in the same manner as a mansion.

The Government argues law enforcement reasonably relied on the warrant, and believed they had the authority to search the camper since it was "nothing more than a place for storage." (Doc. 77 at 4, 7.) No evidence has been presented to indicate any information in the affidavit lacked probable cause or contained false or misleading information. Further, there are no allegations of the magistrate judge abandoning his detached and neutral role.

When a warrant authorizes a search of a residence, and officers become aware the place identified in the warrant includes multiple residences, the validity of the search depends on "whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Garrison*, 480 U.S. at 88. The Second Circuit has decided when officers search a different apartment in the same building as the apartment listed, the good faith

exception does not apply. *See United States v. Bechansky*, 788 F.3d 102, 113 (2d Cir. 2015); *see also United States v. Voustianouk*, 685 F.3d 206, 215 (2d Cir. 2012). "Indeed, there can be no doubt that a search warrant for one apartment in a building does not permit the police to enter apartments other than the one specified in their warrant." *Voustianouk*, 685 F.3d at 215 (citation omitted). The Second Circuit, in both cases, could not find the officers acted in good faith when searching a different residence than the one listed on the warrant.

The Government contends the camper is within the curtilage, thereby allowing the officers to enter and search the inside, similar to a storage shed located in the yard. The officers, however, did not enter a building mistakenly assuming it was a storage shed. *See e.g., Cannon*, 264 F.3d at 878. They entered a camper which clearly can be seen as a separate living space. Unlike a storage unit or shed, the camper "cannot be viewed as an extension of the main house." *Id.* at 879. The outside of the camper would inform a reasonable officer of its capacity to be a residence. Restraining law enforcement from entering a separate living space without judicial oversight is precisely the intent of the Fourth Amendment and the exclusionary rule. *See Herring*, 555 U.S. at 144.

Additionally, the court cannot find that the officers reasonably relied on the warrant. The warrant authorized a search of the ranch house, not of any separate residences that may be on the property. The information provided to Magistrate Judge Doyle before he granted the warrant did not sufficiently describe the possibility of a separate residence on the property. Searching the camper went beyond the confines and scope outlined in the warrant.

The Supreme Court has stated that when officers take "every step that could reasonably be expected of them[,]" the good faith exception will apply. *See Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984). No evidence presented to the court suggests the officers made any effort to get a

second warrant. When the officers realized they needed to enter the camper, they could have obtained a warrant that permitted them to search the camper, instead of "deciding, without any judicial oversight, that the evidence in their possession provided probable cause to do so." *Voustianouk*, 685 F.3d at 216 (citation omitted).

The court recognizes in certain situations officers need to be given "some latitude" for mistakes that occur in the "dangerous and difficult process" of executing search warrants. *Garrison*, 480 U.S. at 87. The Supreme Court and Second Circuit, however, have "rejected the need for such deference when . . . no 'sort of exigency existed when [an official] drafted the affidavit, the warrant application, and the warrant, or when he conducted the search.'" *Voustianouk*, 685 F.3d at 216 (quoting *Groh v. Ramirez*, 540 U.S. 551, 564 n.9 (2004)).

No such exigency existed here. Defendant had been in custody for three days before law enforcement officers obtained a warrant and searched the camper. Any concern over evidence destruction by a third party could have been mitigated by securing the camper while a second warrant was obtained. Furthermore, the Rules of Criminal Procedure allow judges to grant warrants based on information communicated over the telephone—meaning the officers could have called a magistrate judge from the property if necessary. *See* Fed. R. Crim. P. 41(d)(3); *see also Voustianouk*, 685 F.3d at 216 ("There is no question that the officers in this case could have called a magistrate judge on the telephone that very morning to obtain a new search warrant for the second-floor apartment.").

"People—whether renters, couch surfers, or nomads—have a reasonable expectation of privacy in places that function as a home." *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018). A camper like the one in this case can function as a home, and as such, demands the same constitutional protections. The home is the apex of privacy, and when the officers entered the

camper without a warrant and conducted a search, Defendant's Fourth Amendment rights were violated. The court does not doubt the officers' belief there would be evidence of a crime inside the camper. "However, the Fourth Amendment's general rule that the government first obtain a warrant before searching a person's home does not hinge on the strength of an officer's conviction that the evidence of a crime will be uncovered." *Voustianouk*, 685 F.3d at 217. This decision reflects an effort to discourage police misconduct and reinforce adherence to constitutional safeguards.

For the foregoing reasons, Defendant's Motion to Suppress the evidence recovered in the camper is GRANTED. (Doc. 61.)

## Conclusion

Defendant's Motion to Suppress the Glock and Other Fruits of a Vehicle Search is DENIED. (Doc. 62.) Defendant's Motion to Suppress the Three Rifles is GRANTED. (Doc. 61.)

DATED at Rutland, in the District of Vermont, this 12th day of January 2026.

Mary Kay Lanthier
United States District Judge